IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-491

 No. COA21-207

 Filed 21 September 2021

 Mecklenburg County, Nos. 19 JA 289, 290

 IN THE MATTER OF J.R. AND J.C.

 Appeal by Respondent-Mother from orders entered 29 December 2020 by

 Judge David H. Strickland in Mecklenburg County District Court. Heard in the

 Court of Appeals 24 August 2021.

 Keith Smith for Petitioner-Appellee Mecklenburg County Youth and Family
 Services.

 Parker Poe Adams & Bernstein LLP, by W. Coker Holmes, for Appellee
 Guardian ad Litem.

 Freedman Thompson Witt Ceberio & Byrd PLLC, by Christopher M. Watford,
 for Respondent-Appellant Mother.

 COLLINS, Judge.

¶1 Mother appeals from orders awarding guardianship of her sons, James and

 Justin,1 to their maternal grandfather and awarding Mother visitation. Mother

 argues that the trial court erred by concluding that she acted in a manner

 inconsistent with her constitutionally protected status as a parent, determining that

 1 We use pseudonyms for all minors in this opinion to protect their identities. See N.C.
 R. App. P. 42(b).
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 the guardian understood the legal significance of guardianship, ceasing reunification

 efforts, and failing to specify the minimum frequency and duration of visits. We

 affirm in part and remand in part for the trial court to specify the minimum frequency

 and duration of Mother’s visitation.

 I. Procedural History

¶2 Petitioner Mecklenburg County Youth and Family Services filed a juvenile

 petition on 31 July 2019, alleging that James and Justin were neglected and

 dependent. On 17 October 2019, the trial court entered an order adjudicating James

 and Justin neglected and dependent and a disposition order. The trial court placed

 the juveniles with Petitioner, established the primary plan as reunification with the

 juveniles’ parents, and established a secondary plan of guardianship.

¶3 The trial court held a permanency planning hearing on 11 December 2020.

 Following the hearing, the trial court entered a Permanency Planning Hearing Order,

 a Guardianship Order, and a Guardianship Visitation Order. The orders placed the

 juveniles in the guardianship of their maternal grandfather, ceased reunification

 efforts, awarded Mother visitation, and waived further statutory review hearings.

 Mother timely gave notice of appeal.2

 2 Both the Permanency Planning Hearing Order and the Guardianship Visitation
 Order contain the visitation provisions Mother challenges, but Mother’s two notices of appeal
 did not specifically designate the Guardianship Visitation Order as an order from which she
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 II. Factual Background

¶4 Mother has had four children: Justin in 2015, James in 2016, Jackson in 2017,

 and Mary in 2020.3 Mother has a history of child protective service agency

 involvement with her children beginning in October 2015. Petitioner referred Mother

 to services, including domestic violence and mental health services, in October 2015,

 October 2016, April 2017, January 2018, December 2018, and April 2019.

¶5 In July 2019, Jackson was burned, allegedly in a bath, while in the custody of

 Mother’s boyfriend Daquan McFadden. Mother called a medical hotline to seek

 treatment advice in lieu of taking Jackson to the doctor because she wanted to avoid

 further DSS involvement.

¶6 On 29 July 2019, Mother and McFadden were staying at a hotel with James,

 Justin, and Jackson. Mother left the hotel room from about 8 p.m. to midnight. When

 she returned to the hotel room, where McFadden had remained with the children in

 her absence, she went to sleep. The next morning, Officer Mike Dashti of the

 appeals. See N.C. R. App. P. 3(d) (notice of appeal must “designate the judgment or order
 from which appeal is taken”). However, “[i]t is well established that a mistake in designating
 the order appealed from should not result in loss of the appeal as long as the intent to appeal
 from a specific [order] can be fairly inferred from the notice and the appellee is not misled by
 the mistake.” Phelps Staffing, LLC v. S.C. Phelps, Inc., 217 N.C. App. 403, 410, 720 S.E.2d
 785, 791 (2011) (citation and quotation marks omitted). Mother’s intent to appeal the trial
 court’s award of visitation is clear from her second notice of appeal and there is no indication
 that either appellee was misled by the mistake. We will therefore review Mother’s challenge
 to the visitation provisions found in both the Permanency Planning Hearing Order and the
 Guardianship Visitation Order.
 3 James’ and Justin’s fathers are not parties to this appeal.
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 Charlotte Mecklenburg Police Department responded to a 911 call from the hotel

 room. Dashti arrived and observed Mother on the phone with 911. Dashti found

 Jackson lying on the bathroom floor unresponsive, with no pulse, and cold to the

 touch. Dashti observed blood on Jackson’s nose and face, a bruise on Jackson’s

 forehead, and a 10-to-12-inch bloodstain on a pillow on one of the beds.

¶7 Resuscitation efforts were unsuccessful and Jackson was pronounced dead at

 the hospital. An autopsy indicated that Jackson had suffered a

 blunt force injury to his head, a large subdural hematoma,
 a hematoma to his liver, facial abrasions and head
 contusions on his forehead and lip area, a bite mark on his
 left shoulder, and lesions healing on his scrotum and
 buttocks.

 The autopsy concluded that Jackson’s manner of death was homicide, caused by “an

 acute blunt force trauma injury[.]”

¶8 Mother was charged with felony child abuse; McFadden was charged with

 Jackson’s murder. The State dismissed the criminal charge against Mother on

 31 August 2020.

¶9 Petitioner filed the juvenile petition on 31 July 2019, alleging that James and

 Justin were neglected and dependent, and the trial court awarded Petitioner

 nonsecure custody. Petitioner initially placed James and Justin in a home where

 both their fathers lived. On 17 October 2019, the trial court adjudicated James and

 Justin neglected and dependent and entered a disposition order. The trial court
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 maintained the juveniles in Petitioner’s custody and established the primary plan as

 reunification with the juveniles’ parents, with a secondary plan of guardianship. In

 December 2019, Petitioner placed James and Justin with their maternal grandfather

 after allegations that James’ father hit Justin.

¶ 10 Prior to the adjudication hearing, Petitioner prepared a proposed Family

 Services Agreement (“case plan”) for Mother. The trial court adopted this case plan

 in its adjudication order. The case plan required Mother to, inter alia, (1) complete a

 “F.I.R.S.T.” assessment;4 (2) “comply with mental health treatment, [] follow all

 therapeutic recommendations[,]” and take any necessary medication as prescribed;

 (3) complete parenting classes; (4) obtain employment to meet the juveniles’ basic

 needs; and (5) “maintain an appropriate, safe, and stable living environment for

 herself and her children[.]”

¶ 11 The trial court held a permanency planning hearing on 11 December 2020.

 Following the hearing, the trial court entered a Permanency Planning Hearing Order,

 a Guardianship Order, and a Guardianship Visitation Order. In the Permanency

 Planning Hearing Order, the trial court made the following findings of fact regarding

 Mother’s progress on her case plan:

 16. The mother is employed at Wal-Mart but has reduced
 her hours from 30 to 20 because of her SSI. She receives
 approximately $790 per month in SSI. The mother

 4 The record does not include a definition of this acronym.
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

completed parenting classes . . . on June 30, 2020. The
mother is living with a family friend and paying rent. She
has her own room with a queen bed and room for her and
her baby [Mary] . . . . It is not appropriate for these two
juveniles as it is not big enough. The mother had a
F.I.R.S.T. assessment on April 23, 2020. The mother was
recommended to undergo an assessment and drug screen
at Anuvia; however, she refused and hung up on the
F.I.R.S.T. program staff. The drug screen is a part of the
screening process with F.I.R.S.T. The mother was referred
to Family First for a substance abuse assessment on at
least three separate occasions (5/15/2020, 9/24/2020, and
10/29/2020). On all three occasions, she refused treatment.
She did follow through with being assessed during the last
referral on November 13, 2020 and was recommended to
receive both Outpatient Therapy at a frequency of two
times per week and Trauma Therapy; however, the mother
informed . . . the assessing clinician, that she did not
believe in therapy and did not want to engage. The mother
has been discharged twice from Family First and is subject
to be discharged on December 14, 2020 if she does not
respond. She has also not signed her Person-Centered Plan
which needs to be signed before the treatment services can
begin. A referral was made to Thrive for a mental health
assessment. The mother has not done a mental health
assessment at this time. The mother has consistently
maintained with professionals that she did not think
therapy was appropriate for her. The mother has also not
engaged in domestic violence services at this time.

....

21.f. Despite recommendations, the mother has
consistently stated she will not take part in mental health
services despite concerns on her behavior, temper, and
grief of loss of her child.

21.h. Mother does not have housing that can meet the
needs of these juveniles.
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 21.i. She is renting a room from a friend that has a Queen
 bed and pack and play for [Mary].

 ....

 21.k. [Mother’s] criminal case was dismissed on August 31,
 2020 and since then minimal progress was made by the
 mother on her case plan.

 21.l. The court does not have confidence that the mother
 will follow through with the items of the case plan. While
 the court understands she was not able to do certain things
 on her plan due to pending criminal charges, her many
 other actions and statements indicate she will not follow
 through with the services.

 ....

 22.b. The mother is not making adequate progress within
 a reasonable time under the plan.

 ....

 22.i. The mother is acting in a manner inconsistent with
 the health or safety of the juveniles.

¶ 12 The trial court concluded that Mother had “acted in a manner inconsistent with

 [her] constitutionally protected rights as a parent.” The trial court also found that

 further reunification efforts “clearly would be unsuccessful or would be inconsistent

 with the juveniles’ health and safety and need for a safe, permanent home within a

 reasonable period of time.” The trial court determined that the maternal grandfather

 was “ready and able to accept the guardianship of the juveniles,” “under[stood] the

 legal significance of the appointment and has adequate resources to care
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 appropriately for the juveniles.” The trial court therefore ceased reunification efforts

 and appointed the maternal grandfather the guardian of the juveniles.

¶ 13 In the Permanency Planning Hearing Order and Guardianship Visitation

 Order, the trial court awarded Mother multiple forms of visitation. The trial court

 awarded Mother “regular visitation” as follows:

 [Mother] shall have supervised visitation with the minor
 children to occur a minimum of four hours per month. The
 visits are to be supervised by [the maternal grandfather] or
 an approved responsible adult. The day and time of each
 visit will be agreed upon between [Mother and the
 maternal grandfather].

 Mother appeals.

 III. Discussion

 A. Award of Guardianship

¶ 14 Mother challenges the Permanency Planning Hearing Order’s award of

 guardianship of the juveniles to their maternal grandfather. “This Court’s review of

 a permanency planning order is limited to whether there is competent evidence in

 the record to support the findings and whether the findings support the conclusions

 of law.” In re P.O., 207 N.C. App. 35, 41, 698 S.E.2d 525, 530 (2010) (citation omitted).

 Unchallenged findings of fact are binding on appeal. Koufman v. Koufman, 330 N.C.

 93, 97, 408 S.E.2d 729, 731 (1991). We review de novo the conclusion of law that a

 parent acted in a manner inconsistent with the constitutionally protected status of a

 parent. In re D.A., 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018).
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 1. Actions Inconsistent with Mother’s Constitutionally Protected Status
 as a Parent

¶ 15 Mother first argues that the trial court erred by concluding that she acted in a

 manner inconsistent with her constitutionally protected status as a parent.

 Specifically, Mother contends that actions inconsistent with the constitutionally

 protected status of a parent must be “willful, volitional actions of the parent.” Mother

 argues that findings in the trial court’s Permanency Planning Hearing Order are

 therefore deficient because they do not address whether her cognitive “limitations

 affected her allegedly inconsistent conduct or whether [she] could even appreciate the

 consequences of her conduct such that she could intentionally and willfully engage in

 conduct that is truly inconsistent with that of a parent.”

¶ 16 At a permanency planning hearing, the court may set guardianship as the

 juvenile’s permanent plan and appoint a guardian for the juvenile if the court finds

 that doing so is in the juvenile’s best interests. N.C. Gen. Stat. §§ 7B-906.2(a)(3)

 (2020); 7B-600(a) (2020). However, a natural parent has a “constitutionally protected

 paramount interest in the companionship, custody, care, and control of his or her

 child[.]” Price v. Howard, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997) (citations

 omitted). This constitutionally protected interest “is a counterpart of the parental

 responsibilities the parent has assumed and is based on a presumption that he or she

 will act in the best interest of the child.” Id. “Prior to granting guardianship of a
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 child to a nonparent, a district court must clearly address whether [the] respondent

 is unfit as a parent or if [her] conduct has been inconsistent with [her] constitutionally

 protected status as a parent[.]” In re R.P., 252 N.C. App. 301, 304, 798 S.E.2d 428,

 430 (2017) (quotation marks and citation omitted).5

¶ 17 In support of her argument that the trial court was required to find that her

 conduct was willful and intentional, Mother cites In re A.L.L., 376 N.C. 99, 852

 S.E.2d 1 (2020). In re A.L.L. is inapposite, however, because it concerned the

 termination of parental rights under N.C. Gen. Stat. § 7B-1111(a)(7), not the

 appointment of a guardian under sections 7B-600(a) and 7B-906.2(a)(3). See In re

 A.L.L., 376 N.C. at 110-11, 852 S.E.2d at 9. Unlike the statutes at issue in the present

 case, section 7B-1111(a)(7) expressly requires “willful” abandonment of a juvenile or

 “voluntary” abandonment of an infant. N.C. Gen. Stat. § 7B-1111(a)(7) (2020).

¶ 18 Mother also cites Rodriguez v. Rodriguez, 211 N.C. App. 267, 710 S.E.2d 235

 (2011), but Rodriguez is likewise inapposite. In Rodriguez, the paternal

 grandparents sued the natural mother for custody under Chapter 50 and the trial

 court awarded visitation. Id. at 269, 710 S.E.2d at 237-38. We held that the trial

 court erred by concluding that the mother had acted inconsistently with her

 5 While this analysis is often applied in civil custody cases under Chapter 50 of the

 North Carolina General Statutes, it also applies to custody awards arising out of juvenile
 petitions filed under Chapter 7B. In re D.M., 211 N.C. App. 382, 385, 712 S.E.2d 355, 357
 (2011).
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 constitutionally protected status as a parent because the juveniles had previously

 been adjudicated dependent, but not abused or neglected, and there were no

 additional findings of fact sufficient to show that the mother had acted inconsistently

 with her status as a parent. Id. at 279, 710 S.E.2d at 243.

¶ 19 Here, by contrast, the trial court adjudicated James and Justin neglected and

 dependent, and Mother does not challenge this adjudication. Neglect “clearly

 constitute[s] conduct inconsistent with the protected status parents may enjoy.”

 Price, 346 N.C. at 79, 484 S.E.2d at 534. The neglect adjudication was premised on a

 finding that the juveniles lived “in an environment injurious to their welfare because

 they were exposed to the homicide of their brother, [Jackson], and live[d] in the home

 where their brother died as a result of abuse.” The trial court further found that

 Mother had previously called a medical hotline for advice on treating a burn on

 Jackson “instead of taking the child to the doctor because she did not want another

 DSS case.”

¶ 20 Moreover, following the permanency planning hearing, the trial court found

 that Mother had failed to comply with multiple aspects of her case plan. Specifically,

 the trial court found that Mother’s housing was insufficient for James and Justin

 because it was too small; Mother repeatedly refused to engage in therapy and other

 assessments; Mother indicated that she “did not believe in therapy and did not want

 to engage”; and Mother did not engage in domestic violence services.
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

¶ 21 Mother argues that “[t]he evidence does not support the finding that [Mother]

 is not actively participating in and cooperating with the plan because so much of the

 plan bears no logical nexus to the reasons why James and Justin came into custody.”

 This argument is foreclosed by Mother’s failure to challenge the trial court’s

 adjudication order wherein the trial court specifically found that the case plan was

 “in the [children’s] best interests and appropriate to address the issues that led to the

 [children’s] placement[.]” This unchallenged finding of fact is binding on appeal.

 Koufman, 330 N.C. at 97, 408 S.E.2d at 731.

¶ 22 Together, the trial court’s findings of fact support the conclusion of law that

 Mother had acted in a manner inconsistent with her constitutionally protected status

 as a parent. The trial court did not err by applying the best interest of the juvenile

 standard and awarding guardianship.

 2. Verification under N.C. Gen. Stat. §§ 7B-600(c) and 7B-906.1(j)

¶ 23 Mother also argues that the trial court erred by concluding that the maternal

 grandfather understood the legal significance of guardianship as required by N.C.

 Gen. Stat. §§ 7B-600(c) and 7B-906.1(j).

¶ 24 Prior to appointing a guardian under Chapter 7B, “the court shall verify that

 the person being appointed as guardian of the juvenile understands the legal

 significance of the appointment and will have adequate resources to care

 appropriately for the juvenile.” N.C. Gen. Stat. § 7B-600(c) (2020); see also N.C. Gen.
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 Stat. § 7B-906.1(j) (2020) (same). “The Juvenile Code does not require that the court

 make any specific findings in order to make the verification. It is sufficient that the

 court receives and considers evidence that the guardians understand the legal

 significance of the guardianship.” In re L.M., 238 N.C. App. 345, 347, 767 S.E.2d 430,

 432 (2014) (quotation marks and citations omitted). At a permanency planning

 hearing “[t]he court may consider any evidence, including hearsay evidence . . . that

 the court finds to be relevant, reliable, and necessary to determine the needs of the

 juvenile and the most appropriate disposition.” N.C. Gen. Stat. § 7B-906.1(c). This

 evidence may include reports and home studies conducted by the guardian ad litem

 or department of social services. See In re J.E., B.E., 182 N.C. App. 612, 617, 643

 S.E.2d 70, 73 (2007) (trial court which received and considered department of social

 services home study reports complied with section 7B-600).

¶ 25 The trial court conducted the following colloquy with the maternal grandfather

 at the permanency planning hearing:

 THE COURT: Mr. Steele, do you understand that, if I
 appoint you the guardian of these two children that, first
 and foremost, you would be the one mainly financially
 responsible for them? That’s on you.

 MR. STEELE: Right.

 THE COURT: Do you understand that?

 MR. STEELE: Yes.

 THE COURT: All right. And you understand that, if I
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 appoint you the guardian, that you would have the care,
 custody, and control of the juvenile[s] and may arrange for
 a suitable placement for the juvenile[s]? Do you
 understand that?

 MR. STEELE: A suitable placement?

 THE COURT: Yes, sir.

 MR. STEELE: What do you mean by that?

 THE COURT: That means that you would be responsible
 for providing any type of placement for them.

 MR. STEELE: Yes.

 THE COURT: Okay. And that you may also represent the
 juvenile[s] in legal actions before any court. Do you
 understand that?

 MR. STEELE: Yes.

 THE COURT: Do you understand that you may consent to
 certain actions on the part of the juvenile[s] in place of the
 parent, including marriage, enlisting in the armed forces of
 the United States, and enrolling in school?

 MR. STEELE: Yes.

 THE COURT: Do you also understand that, if I appoint you
 the guardian, that you may consent to any necessary
 remedial, psychological, medical, or surgical treatment for
 the juvenile[s]?

 MR. STEELE: Yes.

¶ 26 Social worker Cawan Jenkins also testified that the maternal grandfather

 “underst[ood] what guardianship would entail[.]” Moreover, Jenkins’ court

 summaries, the guardian ad litem’s two reports, and the maternal grandfather’s
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 testimony reflect that James and Justin had lived with the maternal grandfather for

 approximately one year. During that time, the maternal grandfather took the

 juveniles to medical and therapy appointments, ensured their visitation with their

 parents, and financially provided for the juveniles.

¶ 27 Finally, the maternal grandfather testified as follows on direct examination:

 Q. You’re aware that [Petitioner] is recommending that
 the Court grant you guardianship of the juveniles today?

 A. Yes.

 ....

 Q. What is your understanding of the legal significance of
 the appointment of guardianship?

 A. I mean . . . I think that word speaks for itself,
 “guardianship.” I got to be there for them. It’s no off day.
 It’s no off day. I’ve got to be there for them. Like they’re
 just kids. They’re little boys, so it’s all on me. I mean I
 hope I’m wording this right, but it’s all on me to walk them
 through the steps. . . .

 It’s all on me to walk them through the steps, hold their
 hand, and you know, try and get them by this, past this.
 Make sure their appointments are there. Consistently
 make sure they have a place to stay, you know, like they
 have been. It’s a lot of stuff with it, and there’s no day off.
 There’s no day off.

¶ 28 The trial court’s colloquy with the maternal grandfather, the maternal

 grandfather’s testimony, and the evidence submitted by the social worker and

 guardian ad litem was competent evidence in support of the trial court’s conclusion
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 that the maternal grandfather “understands the legal significance of the appointment

 and will have adequate resources to care appropriately for the juvenile[s].” The trial

 court did not err in making the verification required by sections 7B-600(c) and

 7B-906.1(j).

 B. Cessation of Reunification Efforts

¶ 29 Mother argues that the trial court erred by ceasing reunification efforts

 because the record does not show that such efforts clearly would be unsuccessful or

 inconsistent with the juveniles’ health or safety.

¶ 30 “This Court reviews an order that ceases reunification efforts to determine

 whether the trial court made appropriate findings, whether the findings are based

 upon credible evidence, whether the findings of fact support the trial court’s

 conclusions, and whether the trial court abused its discretion with respect to

 disposition.” In re M.T.-L.Y., 265 N.C. App. 454, 466, 829 S.E.2d 496, 505 (2019)

 (citation omitted).

¶ 31 At any permanency planning hearing, the trial court may cease reunification

 efforts upon making “written findings that reunification efforts clearly would be

 unsuccessful or would be inconsistent with the juvenile’s health or safety.” N.C. Gen.

 Stat. § 7B-906.2(b). To determine whether reunification efforts “clearly would be

 unsuccessful or would be inconsistent with the juvenile’s health or safety,” the trial

 court must make written findings concerning:
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 (1) Whether the parent is making adequate progress within
 a reasonable period of time under the plan.

 (2) Whether the parent is actively participating in or
 cooperating with the plan, the department, and the
 guardian ad litem for the juvenile.

 (3) Whether the parent remains available to the court, the
 department, and the guardian ad litem for the juvenile.

 (4) Whether the parent is acting in a manner inconsistent
 with the health or safety of the juvenile.

 N.C. Gen. Stat. § 7B-906.2(d); In re D.C., 275 N.C. App. 26, 29, 852 S.E.2d 694, 697

 (2020).

¶ 32 Here, the trial court found that reunification efforts with Mother “clearly would

 be unsuccessful or would be inconsistent with the juveniles’ health and safety and

 need for a safe, permanent home within a reasonable period of time.” The trial court

 also made the following findings, as required by section 7B-906.2(d):

 22.b. The mother is not making adequate progress within
 a reasonable time under the plan.

 ....

 22.e. The mother is not actively participating in and
 cooperating with the plan, YFS and the guardian ad litem
 for the juveniles.

 ....

 22.g. The mother . . . [has] remained available to the Court,
 YFS, and [the] guardian ad litem for the juveniles.

 ....
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 22.i. The mother is acting in a manner inconsistent with
 the health or safety of the juveniles.

 Mother acknowledges that these findings comply with section 7B-906.2(d), but argues

 that they are unsupported or contradicted by evidence in the record. We disagree.

¶ 33 Credible evidence in the record supports the findings that Mother was not

 making adequate progress within a reasonable time under her case plan and was not

 actively participating in and cooperating with the plan, Petitioner, and the guardian

 ad litem. A court summary prepared by social worker Jenkins and admitted into

 evidence indicated that Mother refused to complete recommended mental health

 assessments and drug screenings on multiple occasions. The trial court also admitted

 into evidence a letter from a Family First Program Manager stating that

 [Mother] was referred to Family First on at least 3 separate
 occasions: 5/15/20, 9/24/20 and 10/29/20. On all three
 occasions, [Mother] refused treatment. She did follow
 through with being assessed during the last referral on
 11/13/20 and was recommended to receive both OPT at a
 frequency of 2x per week and Trauma Therapy; however,
 [Mother] informed [the] assessing clinician, that she did
 not believe in therapy and did not want to engage. Please
 note that [Mother] was discharged twice and currently her
 case is still open and subject to be discharged on 12/14/20
 if she does not respond. She also has yet to sign her Person-
 Centered Plan (PCP) which needs to be signed by [Mother]
 and service order approved before treatment services can
 begin.

¶ 34 Jenkins’ summary also reflected that Mother had not engaged in domestic

 violence services despite a history of domestic violence with child protective service
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 involvement. At the permanency planning hearing, Jenkins testified that Mother

 failed to follow through with the recommendations of the assessments she did

 complete, “which include[d] substance abuse services, outpatient services as well as

 a mental health assessment.” The guardian ad litem’s two reports, which were also

 admitted into evidence, reflect that Mother had “outbursts of anger and yelling”

 towards the social worker supervising her video visitation with the juveniles in July

 2020; Mother had “not sought Mental health services to assess her needs”; and “[w]ith

 further explanation, [Mother] seemed to understand how therapy or counseling may

 help her be her best for herself and her children, but in the next conversation, she

 would again argue the need for it.” Mother suggests that her cooperation with the

 case plan was hindered by her pending criminal charge, but does not challenge the

 trial court’s finding that she made minimal progress on her case plan even after the

 charge was dismissed on 31 August 2021.

¶ 35 Credible evidence also supports the finding that Mother was “acting in a

 manner inconsistent with the health or safety of the juveniles.” The trial court found

 that James and Justin were previously adjudicated neglected and dependent based

 on the circumstances of Jackson’s death, James and Justin’s exposure to Jackson’s

 death, and Mother’s decision not to seek medical treatment for Jackson’s burns to

 avoid further DSS involvement. Mother also failed to secure appropriate housing for

 James and Justin to live with her. Specifically, the social worker testified that the
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 room where Mother was staying was not appropriate for James and Justin to join her

 because there was not enough space.

¶ 36 Mother contends that her continued custody of Mary contradicts the trial

 court’s finding that she was acting in a manner inconsistent with the juveniles’ health

 or safety. The trial court had discretion to weigh this evidence, In re T.H., 266 N.C.

 App. 41, 45, 832 S.E.2d 162, 165 (2019), and could consider it in light of the active

 child protective service involvement with Mary at the time of the permanency

 planning hearing and evidence that Mother asks her father to babysit Mary “for days

 at a time.”

¶ 37 The trial court’s finding that further reunification efforts clearly would be

 unsuccessful or would be inconsistent with the juveniles’ health or safety was

 supported by credible evidence in the record, and these findings support the trial

 court’s cessation of reunification efforts.

 C. Visitation Order

¶ 38 Lastly, Mother argues that the trial court violated N.C. Gen. Stat.

 § 7B-905.1(c) by failing to specify the minimum frequency and duration of her visits

 with James and Justin.

¶ 39 “This Court reviews the trial court’s dispositional orders of visitation for an

 abuse of discretion.” In re C.M., 183 N.C. App. 207, 215, 644 S.E.2d 588, 595 (2007)

 (citations omitted). Where the trial court places the juvenile with a guardian, “any
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 order providing for visitation shall specify the minimum frequency and length of the

 visits and whether the visits shall be supervised. The court may authorize additional

 visitation as agreed upon by the respondent and custodian or guardian.” N.C. Gen.

 Stat. § 7B-905.1(c) (2020).

¶ 40 The trial court’s Visitation Order provides that Mother

 shall have supervised visitation with the minor children to
 occur a minimum of four hours per month. The visits are
 to be supervised by [the maternal grandfather] or an
 approved responsible adult. The day and time of each visit
 will be agreed upon between [Mother] and [the maternal
 grandfather].

¶ 41 This provision can be read to require a minimum of one visit of four hours per

 month, or it can be read to require multiple visits of shorter duration for a total of

 four hours per month. Throughout much of the history of the case, Mother’s

 supervised visitation was two hours, twice per month. The Guardian ad Litem

 recommended supervised visitation twice per month. Petitioner’s court report

 referred to supervised visitation “twice per month for a total of two hours each time.”

 When rendering the order, the trial court stated that it was “going to adopt the

 visitation plan that was submitted by [Petitioner][,]” which provided for supervised

 “visitation with the minor children to occur a minimum of four hours per month.”

¶ 42 Although the Visitation Order’s provision did specify a minimum amount of

 visitation of 4 hours per month, the provision does not unambiguously articulate the
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

 minimum frequency and length of the visits. Accordingly, we remand for the trial

 court to set the minimum frequency of the visitation, as required by section

 7B-905.1(c).

¶ 43 Mother also argues that the visitation order amounts to an impermissible

 delegation of judicial authority. We disagree. “While our case law recognizes that

 some decision-making authority may be ceded to the parties with respect to visitation,

 it also reveals that an order is less likely to be sustained as judicially-imposed

 structure decreases and the decision-making party’s unfettered discretion increases.”

 Peters v. Pennington, 210 N.C. App. 1, 20, 707 S.E.2d 724, 738 (2011). In this case,

 the trial court did not grant the guardian any unfettered discretion to modify or

 suspend visitation. Instead, the trial court left only the day and time of each visit to

 be agreed upon by Mother and the guardian. The trial court did not abuse its

 discretion by granting this limited degree of flexibility to the parties.

 IV. Conclusion

¶ 44 The trial court’s findings of fact supported its conclusion of law that Mother

 acted inconsistently with her constitutionally protected status, and the trial court

 appropriately verified the maternal grandfather’s understanding of the legal

 significance of guardianship. Accordingly, the trial court did not err in awarding

 guardianship of James and Justin to the maternal grandfather. The trial court did

 not err by ceasing reunification efforts and did not impermissibly delegate judicial
 IN RE J.R. AND J.C.

 2021-NCCOA-491

 Opinion of the Court

authority in its award of visitation. We remand to the trial court to specify the

minimum frequency and duration of visitation as required by section 7B-905.1(c).

 AFFIRMED IN PART, REMANDED IN PART.

 Chief Judge STROUD and Judge DIETZ concur.